**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| In re | )<br>)<br>) |
| JAMES KARATHEODORE and<br>CONSTANCE N. KARATHEODORE, | ) Chapter 13<br>) Case No. 07-16954<br>) |
| Debtors | )<br>) |
| KEVIN TAYLOR | )<br>)<br>) |
| Plaintiff | ) Adversary Proceeding<br>) No. 08-1025 |
| v. | )<br>) |
| JAMES KARATHEODORE, | )<br>) |
| Defendant | )<br>) |

**MEMORANDUM OF DECISION**

Kevin Taylor ("Taylor") filed this adversary proceeding in the bankruptcy case of James Karatheodore (the "Debtor") and Constance N. Karatheodore to determine the dischargeability of the Debtor's debt to Taylor arising out of his investment in a restaurant venture that the two entered with the Debtor's son. Taylor invested $250,000 in the venture in return for a twenty percent stock interest in the business. The Debtor owned a one percent interest in the business and his son, John Karatheodore, owned the other seventy-nine percent interest. Taylor argues that the Debtor breached his duties of good faith and fair dealing, as well as his duty of loyalty to a co-shareholder, by arranging to have his investment repaid without disclosure to Taylor. Taylor recovered a default judgment against the Debtor in state court before the bankruptcy was filed, but

Page 1

contested the assessment of damages in state court.  Taylor argues that the Debtor's liability for the foregoing conduct is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt for money obtained by false pretenses and under 11 U.S.C. § 523(a)(4) as a debt for fraud or defalcation while acting in a fiduciary capacity.  After a one-day trial, the court now makes the following findings of fact and rulings of law and holds that the Debtor's obligations to Taylor are not excepted from discharge.

**FACTS**

The following findings of fact are derived from the testimony of the witnesses at the trial, which included the plaintiff Kevin Taylor, the defendant and Debtor, James Karatheodore, and the Debtor's son, John Karatheodore, as well as eighteen documentary exhibits that were jointly introduced by the parties.  The parties also stipulated as to certain facts, which provide a further basis for the following findings.

JGK Enterprises, LLC ("JGK") is a limited liability company that owned and operated a bar and restaurant known as "The Office Bar and Grill," located at 9 Broad Street in Boston's financial district (hereinafter "the Office").  John Karatheodore (hereinafter "John") was managing a restaurant in Boston in about 1999 when the owner of the Office offered to sell him the business for about $269,000.  John borrowed $100,000 of the purchase price from the former owner and paid the balance with a $169,000 loan from his father, the Debtor, who funded the loan by borrowing against his own house, encumbering his house with a home equity mortgage.  The testimony is that JGK began to make payments to the Debtor or directly to his lender, eventually paying the loan down to approximately $67,000.  After the initial loan from the Debtor, John

needed more capital, so his father refinanced the initial loan and borrowed another $30,000 on a home mortgage and in turn loaned that amount to JGK for use in the business. After the refinancing transaction JGK owed the Debtor approximately $100,000. John estimated that in total the Debtor loaned or, in his words, "invested" $230,000 in the Office. It was unclear how much of this loan was repaid to the Debtor. As a result of his loans to JGK, the Debtor received a one percent interest in JGK. John owned the balance of the stock until Kevin made his investment in the enterprise in 2003.

John testified that he was friendly with Kevin who, in about 2003, had just returned to Massachusetts. Kevin had previously managed some restaurants and was interested in investing in a restaurant business and in working at the business as its manager. At the same time John was expanding the Office business to include a night club on the second floor of the building where it operated under a lease. After some discussion and several meetings, John and Kevin agreed that Kevin would purchase a twenty percent interest in JGK for $250,000, which purchase they memorialized in a rudimentary purchase and sale agreement dated July 7, 2003. Kevin testified that it was fundamental to his investment decision that he would be given managerial responsibility of the Office business and that a second location would be opened through the efforts of John and the Debtor. John testified that he never introduced the idea of opening a second location for JGK, but Kevin claimed that John stated his intention to do so during their negotiations. At the heart of Kevin's claims in this adversary proceeding are his assertions that (i) someone—either the Debtor or John in the presence of the Debtor—made a representation to him that he would be made the

manager of the Office *so that a second location could be opened* and (ii) that this representation was false in that neither John nor the Debtor had any intention at that time of opening a second location.

John also described the Debtor's role in the negotiations between John and Kevin regarding Kevin's investment in the business. His recollection of these facts is at variance with those of Kevin. John testified that his father was made a one percent owner only so that they had another name to add to the corporate documents. He says that his father had no role in management decisions and was never present for business negotiations with Kevin. All investment discussions and negotiations were between John, Kevin, and, eventually, their respective lawyers. John described a gathering at a Quincy, Massachusetts restaurant between Kevin, John, and their families, including the Debtor, at or about the time of Kevin's investment. John described the gathering as "one hundred percent social," an opportunity for the parents to meet John's new partner.

Kevin recalled the Debtor's involvement differently, but his recollection was vague. He claimed that he had "numerous" conversations with the Debtor prior to his investment. Kevin was asked several times to recount the specific representations that the Debtor made to him, and he responded that "[Debtor] was a very cordial guy, seemed very enthusiastic that I was coming on board, stated things to that effect." Also, on direct examination, Kevin was asked whether he had "any conversation with [the Debtor] regarding expansion of the business," to which he replied that there were numerous conversations prior to entering the business, including a meeting at a Quincy restaurant. Kevin never provided any detail or articulated other statements made by the

Debtor to him regarding investment in JGK. Nor was Kevin able to identify any conversation he had with John, in the Debtor's presence, in which John made any misrepresentations. Kevin also testified on cross-examination that he never talked to the Debtor about the stock purchase agreement prior to its being signed.

The Debtor testified that his only involvement with the business was to work in the kitchen. He filled in as needed, but he worked there most days after 2004. Debtor is a retired mechanical engineer and had spent his career working at Polaroid. He testified, and I find credible, that he had no role in the financial transactions of JKG, that he never had check signing authority, that he never reviewed the books and records of the company, that he never signed any documents on behalf of the company, and that he never signed any tax returns filed by the company. The Debtor specifically denied engaging in any negotiations with Kevin about his investment and said he never made any representations to Kevin prior to his investing. In fact, he said that he had not seen any of the written agreements associated with Kevin's investment. The Debtor recalled the gathering at the Quincy restaurant as a social event attended by both families, including Kevin's parents and girlfriend, none of whom testified at the trial. For his part, Kevin contradicted none of this testimony with any detailed facts.

There was also testimony about the way in which the Debtor's loans to JGK were repaid. Kevin identified several corporate tax returns that reflected a "pay down" of the Debtor's loans. These returns also reflected certain loan repayments to John. Kevin testified that there were never any board meetings or management meetings at which these loan repayments were discussed and authorized.

In addition to the purchase and sale agreement, JGK and Kevin entered an employment agreement dated July 25, 2003. John signed for JGK. According to the agreement, Kevin was employed as a manager of the Office and was to be paid $30,000 per year, with any bonuses to be negotiated in the future. It was a one-year term agreement in which Kevin committed to working forty hours per week. JGK could terminate the agreement for cause.

The relationship between the parties soured rather quickly. It seems that Kevin was disappointed that there was no progress on opening a second location and that he had to share management responsibilities with both John and, according to Kevin, the Debtor. John testified that Kevin worked much less than the agreed forty hours per week and was frequently absent from the restaurant. Soon, there were financial difficulties, and JGK paid Kevin less than the agreed salary. Finally, according to Kevin, after consulting with a lawyer, he served a notice of constructive termination on JGK because he was not being paid.

Eventually Kevin sued John and the Debtor in state court, alleging breach of the duties of utmost good faith and fair dealing owed to co-shareholders of closely held businesses in Massachusetts. The Debtor, who by then was in financial trouble, failed to answer the complaint and was defaulted. The state court held an assessment of damages hearing at which the Debtor appeared and testified. After the hearing, the judge entered a judgment against the Debtor in the amount of $66,813.00, finding that his conduct was "not as egregious as that of [John]."

**POSITIONS OF THE PARTIES**

Kevin argues that his claims against the Debtor are nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(4). These claims are stated in a single count captioned "Breach of Fiduciary Duty." The essence of the claims seems to be as follows: for his claim under § 523(a)(2)(A), that the Debtor deprived Kevin of money through false pretenses or actual fraud; and, for his claim under § 523(a)(4), that the Debtor engaged in fraud or defalcation while acting in a fiduciary capacity. Kevin alleges that the Debtor misrepresented to him that in return for a $250,000 investment, Kevin would be given managerial responsibility for the Office business and that the Debtor and John would focus on opening a second location. Kevin also alleges that the Debtor owed him a duty of utmost good faith and loyalty, which the Debtor breached when he and John arranged to have JGK repay the Debtor's loan without Kevin's involvement and specific authority, in violation of § 523(a)(4). Kevin also relies on the doctrine of collateral estoppel, saying that the state court's judgment at the damages assessment hearing is binding on this court.

The Debtor argues that Kevin has failed to establish fraud, false pretenses, or defalcation. He says that there is no evidence that the Debtor made any representation whatsoever to Kevin, much less a misrepresentation. He also argues that the doctrine of collateral estoppel does not apply where the state court judgment as to liability was premised on the Debtor's default rather than on a full determination on the merits. He urges that the court find that a determination at an assessment of damages hearing is not a determination on the merits as to liability.

**ANALYSIS**

I start with consideration of Kevin's claim that he is entitled to a judgment that his claims against the Debtor are excepted from discharge because the state court's judgment is binding on this court under principles of issue preclusion. The doctrine of collateral estoppel applies in bankruptcy dischargeability proceedings. Grogan v. Garner, 498 U.S. 279, 285 n.11 (1991); Backlund v. Stanley-Snow (In re Stanley-Snow), 405 B.R. 11 (1st Cir. BAP 2009). We look to the law of Massachusetts on the doctrine of collateral estoppel to determine whether the defendant is in fact estopped by the state court judgment from relitigating the issue. While it is within a court's discretion to apply collateral estoppel to a default judgment, such as we have here, in Massachusetts default judgments are generally not given collateral estoppel effect on an issue in a subsequent action because the issues have not been actually litigated. Treglia v. McDonald, 430 Mass. 237, 241 (1999). "The Supreme Judicial Court of Massachusetts has noted that the 'guiding principle' in determining whether to allow a party to use collateral estoppel is whether the party against whom it is asserted had a full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue." Backlund v. Stanley-Snow, 405 B.R. at 18 (citing Treglia v. McDonald, 430 Mass. at 241) (internal quotations omitted).

In this case the Debtor did not have a full and fair opportunity to litigate the claims against him in the state court. Although there was a trial in order for the court to assess damages, there was no trial or even any meaningful pretrial litigation on the issue of liability in state court. In part this is because the Debtor did not have the resources to contest the liability portion of the action against him and never filed an

answer to Kevin's complaint. For these reasons, this case is entirely unlike the Backlund case, in which the Debtor engaged in full pretrial discovery and the default entered only after the Debtor failed to appear at the trial itself. Id. at 20. Accordingly, I conclude that the Debtor is not precluded by the state court judgment from litigating any issue in this proceeding.

In light of this ruling on collateral estoppel, I must now consider whether Kevin has carried his burden of establishing that the Debtor's conduct was sufficient to warrant a determination of nondischargeability. In furtherance of the Bankruptcy Code's "fresh start" policy, exceptions to discharge are narrowly construed. Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997). As a creditor seeking a determination of nondischargeability, Kevin bears the burden of proving that his claims against the Debtor come squarely within an exception enumerated in § 523(a), and he must prove his case by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1995).

Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). According to the First Circuit Court of Appeals,

> [i]n order to establish that a debt is nondischargeable because obtained by 'false pretenses, a false representation, or actual fraud,' we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's

>reliance was justifiable, and 6) the reliance upon the false statement caused damage.

McCrory v. Spigel (In re: Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (citing Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997)).

In this case Kevin has not established that the Debtor made any false statement to him whatsoever.  At best, all Kevin could say at trial was that John told him that Kevin's joining the business would provide them an opportunity to focus on expanding to a second location, and that perhaps John made this statement to Kevin in the presence of the Debtor.  Kevin seems to imply that the Debtor, if he was present when this statement was made, remained silent and thereby adopted John's statement as his own.  Both the Debtor and John deny that this statement was ever made to Kevin.  John agrees only that there was discussion about opening a night club on the second floor—not a statement of definite intent to open a second location—but maintains that even this limited discussion did not occur with the Debtor present.  I find the Debtor and John credible in this regard.  Moreover, Kevin offered no evidence whatsoever that the Debtor intended to deceive him in any way.  Consequently, Kevin has failed to carry his burden under § 523(a)(2)(A).

Subsection 523(a)(4), as relevant here, excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity."  11 U.S.C. § 523(a)(4).  Again, in view of the fresh start policy, the burden of proof is on the creditor to establish that his claim comes squarely within the § 523(a)(4) exception. Century 21 Balfour Real Estate v. Menna (In re: Menna), 16 F.3d 7, 9 (1st Cir. 1994).  In order to prevail on this objection to discharge, Kevin must establish by a preponderance of the evidence that the Debtor, while acting in a fiduciary capacity, engaged in actual fraud or commited a

defalcation that resulted in the debt that Kevin seeks to except from discharge. I have already discussed the issue of fraud and have determined that the Debtor communicated no misrepresentations to Kevin; accordingly, that basis for objecting to discharge under subsection (a)(4) is not established. The issue then is whether Kevin has shown a defalcation by the Debtor.

In the case of Rutanen v. Baylis (In re Baylis), 313 F.3d 9 (1st Cir. 2002), the Circuit Court analyzed in some detail the meaning of the word "defalcation" as it is used in § 523(a)(4). There the court stated, "we find that a defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement." Id. at 18-19. Proof of a defalcation therefore requires no showing of specific intent. The court went on to elaborate, however, that a creditor must nonetheless "be able to show that a debtor's actions were so egregious that they come close to the level that would be required to prove fraud, embezzlement, or larceny." Id. at 20. I find that the Debtor's conduct in this case does not come close to meeting this standard. The allegations are that the Debtor received loan repayments during the period of time after Kevin made his investment in JGK and that the payments were made without Kevin's knowledge and consent. In fact, the uncontroverted evidence is that the Debtor's loans were being repaid long before Kevin made his investment and that such repayments were in the ordinary course of JGK's business and certainly not the product of fraud, embezzlement, or larceny. His loans were true loans, and their repayment was not a distribution on account of his minimal equity interest. There is simply no evidence of actionable defalcation on the part of the Debtor, as that term is

construed by the Circuit Court, that supports Kevin's objection to discharge on the basis of § 523(a)(4).[1]

**CONCLUSION**

Based on the foregoing, Kevin has failed to establish by a preponderance of the evidence that the debt owed to him by the Debtor is nondischargeable under 11 U.S.C. § 523(a).  Therefore, judgment shall enter for the Debtor.

Date:  April 7, 2011

_____
Frank J. Bailey
United States Bankruptcy Judge

---

[1] In light of my determination that Kevin has failed to establish a defalcation on the Debtor's part, I need not reach the issue of whether the Debtor's alleged actions were performed "while acting in a fiduciary capacity" within the meaning of § 523(a)(4).